**John GRAHAM, as Executor of the Last Will and Testament of Anne H. Graham, Plaintiff,**

v.

**PLAYTEX PRODUCTS, INC., Defendant.**

No. 95–CV–1366.

United States District Court,
N.D. New York.

Feb. 2, 1998.

Bohl, Della Rocca & Dorfman, P.C., Albany, NY (James B. Tuttle, of counsel), for Plaintiff.

Thorn and Gershon, Albany, NY (Richard M. Gershon, Noreen J. VanDoren, of counsel), Wright, Robinson, Osthimer & Tatum, Richmond, VA (William H. Robinson, Jr., C. Ervin Reid, of counsel), for Defendant.

## MEMORANDUM, DECISION & ORDER

McAVOY, Chief Judge.

In a bench decision rendered December 8, 1997, this Court reserved decision on defendants' summary judgment motion as to plaintiff's product liability claims based on a design defect theory. Because of a dispute as to the reliability and relevance of plaintiff's expert testimony, the Court held a hearing on January 5, 1998 to determine whether that testimony met the standard of admissibility required under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). This decision disposes of the pending motions.

## I. BACKGROUND

### A. Facts

This is a wrongful death action sounding in product liability. **Plaintiff John Graham** alleges that the decedent, his wife Anne, contracted and died from toxic shock syn-

drome ("TSS") in March of 1994, as a result of using tampons manufactured by **defendant Playtex Products, Inc.** Plaintiff contends that his wife used Playtex Regular Tampons during her menstrual period immediately preceding her illness.

TSS is a rare but potentially serious disease. The condition is believed to be caused by a toxin or toxins produced by certain strains of *staphylococcus aureus* ("*staph aureus*"). The toxin most commonly associated with menstrual TSS is known as toxic shock syndrome toxin–1 ("TSST–1") though there is literature which indicates other toxins may be involved. The basic theory of menstrual TSS is that the *staph aureus* bacteria, present as part of the normal vaginal flora of a certain percentage of women, produce TSST–1 which permeates the vaginal mucosa, enters the bloodstream, and produces the clinical symptoms of TSS in the few women who lack protective antibodies.

The Playtex tampons used by plaintiff's decedent at the time of her death and for several days prior were made of viscose rayon,[1] apparently useful because of its "super absorbency." Plaintiff has designated two experts in microbiology, Drs. Bruce A. Hanna and Philip M. Tierno, Jr., each associated with the New York University Medical Center and involved in TSS research. Each of these experts contends, on the basis of laboratory evidence as published in scientific journals, that TSST–1 production is influenced by the composition of the tampons in which the *staph aureus* is cultivated. They further argue that they have demonstrated experimentally and published that TSST–1 levels are highest in products containing rayon and can be significantly reduced in tampons manufactured of all cotton. This is the basis of plaintiff's products liability claim: to wit, rayon tampons are not reasonably safe because they are associated with a higher risk of TSS than cotton tampons. In fact, the two experts concluded in a 1994 study that commercially available tampons manufactured entirely out of cotton are the safest tampons for human use.

**B. Procedural History**

Plaintiff filed his complaint, as executor of his wife's estate, on September 22, 1995. The first and second causes of action allege that defendant was negligent in the design, manufacture, sale, marketing and promotion of the tampons in issue. The third and fourth causes of action sound in strict products liability and allege that the tampons in issue were defectively designed. The fifth and sixth causes of action set out claims for breach of implied warranties and allege defendant breached implied warranties of merchantability and fitness for a particular purpose. Plaintiff also seeks punitive damages for defendant's alleged willful, wanton and grossly negligent conduct.

Defendant moved for summary judgment dismissing all claims. In a December 8, 1997, decision from the bench, the Court granted summary judgment as to plaintiff's warranty claims and reserved as to the product liability claims, pending a hearing on the admissibility of plaintiff's expert testimony under *Daubert.*

The *Daubert* hearing was held in Albany, New York on January 5, 1998. Three witnesses testified at the hearing: for defendants, Dr. Jeffrey Parsonnet, Associate Professor of Medicine and Microbiology at Dartmouth Medical School and Staff Physician at Dartmouth Hitchcock Medical Center; for plaintiff, Drs. Hanna and Tierno.

**II. Discussion**

**A. Standard Under Daubert and F.R.E. 104**

Under F.R.E. 104(a), "[p]reliminary questions concerning ... the admissibility of evidence shall be determined by the court ...". Under *Bourjaily v. United States,* 483 U.S. 171, 175–176, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987), the admissibility of evidence must be established by a preponderance of the evidence. Moreover, it is the proponent's burden under *Daubert* to establish admissibility, rather than the opponent's burden to establish inadmissibility. *See, e.g., Lust v. Merrell Dow Pharmaceuticals,* 89 F.3d 594, 598 (9th

---

1. Viscose is an amber-colored, syruplike solution made by treating cellulose with sodium hydrox-

ide and carbon disulfide; it is used in making rayon thread and fabrics, and cellophane.

Cir.1996); *Golod v. Hoffman La Roche*, 964 F.Supp. 841, 860 (S.D.N.Y.1997).

Defendant argues that the expert testimony at issue is inadmissible under F.R.E. 702, which provides that expert opinion testimony is admissible only when "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue . . .". The Supreme Court, in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), made explicit the standard district courts must apply in evaluating the admissibility of scientific evidence:

> Faced with a proffer of expert scientific testimony . . . the trial judge must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid . . .

*Id.* at 2796 (footnotes omitted).

The *Daubert* inquiry is thus a two step process. The first part, requiring that an expert's testimony be based on " 'scientific knowledge[,]' establishes a standard of evidentiary reliability." *Id.* at 2795. In determining whether evidence is based on scientific knowledge, courts are to consider the following factors: (1) whether the scientific theory can be and has been tested; (2) the extent to which the theory has been subject to peer review and publication; (3) the known or potential rate of error of any scientific technique at issue; and (4) whether the theory is generally accepted within the relevant scientific community. *Id.* at 2796–97. This list is not definitive. *Daubert* at 2796–97.

The second part of the inquiry—whether the expert testimony will assist the trier of fact in understanding or determining a fact in issue—essentially asks whether the expert's testimony "fits" the facts of the case. *Daubert* at 2796. This is a relevance standard. Moreover, "the 'helpfulness' standard incorporated in [F.R.E.] 702 means that the expert's opinion must relate to an issue that is actually in dispute and must provide a valid scientific connection to the pertinent inquiry." Margaret A. Berger, *Procedural Paradigms for Applying the Daubert Test,* 78 Minn.L.Rev. 1345, 1351 (1994) [hereinafter Berger].

Defendant moves to exclude plaintiff's expert testimony under both prongs of the analysis.

### B. Plaintiff's Experts' Theories/Methodology

Because defendant's arguments deal with the specifics of plaintiff's experts' theory and the experiments upon which that theory is based, some discussion of those matters is necessary.

Plaintiff's experts' theory is that the presence of a tampon in the vagina during menstruation, with its ability to absorb menstrual fluid, creates an environment conducive to the production of toxin by the bacteria, e.g., the production of TSST–1 by *staph aureus*. In their opinion, viscose rayon fiber, in any percentage of tampon composition, causes increased toxin production, or amplification of toxin, as compared to the toxin that normally would be produced by the bacteria in the presence of 100% cotton tampons. The experts do not claim that there would be no risk of menstrual TSS to women using 100% cotton tampons; only a lesser risk. The most recent epidemiological data suggest an overall incidence rate of TSS in menstruating women of 1.05 cases per 100,000, a figure with which Dr. Hanna does not take issue. *See* Gaventa, et al., *Active Surveillance for Toxic Shock Syndrome in the United States,* 11 REVIEWS OF INFECTIOUS DISEASES S28 (Supp.1, Jan.–Feb.1989); Hanna Aff. in Opp. to SJ Motion ¶ 7 (putting incidence rate at 1–2 cases per 100,000 women).

Drs. Hanna and Tierno have been testing tampons and testifying in tampon-related litigation since the early 1980's. Their testing methodology is as follows: they place a bacterial growth fluid, or "broth", in a flask, then add bacteria which are capable of producing the TSST–1, and add various tampons to different flasks. The flask is then incubated overnight, permitting the bacteria to grow and produce toxin. The amount of toxin

present in the broth contained in each flask is then measured the next day. The measurement is taken in terms of micrograms of toxin per milliliter of fluid. *See generally* Transcript of 1/5/98 Hearing [hereinafter "Tr."] at 82–86.

The results of these experiments are illustrated in a 1994 study conducted by Drs. Hanna and Tierno. In that study, the experts compared the amount of toxins produced in flasks containing Tampax, OB, Playtex and Kotex tampons, all containing rayon, with the amount produced in flasks containing Terra Femme and Natracara tampons, both made of 100% cotton.[2] According to their experiments, measurable amounts of TSST–1 were found in all of the flasks except those containing the Terra Femme and Natracara tampons. *See* Philip M. Tierno, Jr. and Bruce A. Hanna, *Propensity of Tampons and Barrier Contraceptives to Amplify* Staphylococcus aureus *Toxic Shock Syndrome Toxin–1,* 2 INFECTIOUS DISEASES IN OBSTETRICS AND GYNECOLOGY 140, 143 T.2 (1994) [hereinafter *Propensity of Tampons* ]. The two all-cotton brands "produced no measurable toxin." *Id.* at 141.

Moreover, the experts hypothesize in *Propensity of Tampons* that 100% cotton tampons present a decreased risk of TSS because cotton fiber actually *absorbs* TSST–1. *Id.* at 143. This absorbing ability, they theorize, is lost when cotton fibers are combined with rayon. *Id.* at 144.

## C. Defendant's Arguments

### 1. "Fit"

Defendant's first objection to plaintiff's expert testimony ostensibly is based upon the second prong of the *Daubert* analysis—the "fit" requirement. Defendant argues that the experts' experiments, upon which their conclusions are based, do not have a valid scientific connection to the pertinent issues. Specifically, defendant argues that: (1) the test tube experiments upon which the experts rely cannot be extrapolated to the human situation; (2) the conditions of the laboratory tests bear no relation to actual tampon use; and (3) there is no evidence that the bacteria used in their experiments were present in the decedent's vagina or anywhere else.

### a. Sufficiency of *in vitro* testing/actual tampon use

As to the first two of these objections, the testimony at the hearing on each of these points was, unsurprisingly, conflicting. Dr. Parsonnet noted that while *in vitro* experiments have some value, they are insufficient on their own to support a conclusion that a particular tampon fiber is safer than another. Tr. at 34. He also testified that there are a number of factors distinguishing the vaginal environment from the controlled, in vitro environment in which Drs. Hanna and Tierno's experiments were conducted. *Id.* at 34–35. Dr. Hanna testified, however, that because cotton tampon products were only *recently* introduced, *in vitro* studies must suffice until supporting epidemiological data can be developed, and that the studies were a reasonable basis from which to infer probability of risk:

> In order to determine what the relative risk of a product in use is, epidemiologic data is certainly the single most important criteria. In order to predict what the probability of risk is likely to be, you can use other types of data such as *in vitro* laboratory data which is what we have. And certainly in the absence of any retrospective epidemiologic data our position is it becomes prudent to rely upon the *in vitro* data especially after it is proven predictive for three other fiber products.

Tr. at 120–21.

■ What this conflicting testimony suggests, however, is that these specific objections are addressed not to plaintiff's experts' *methodology,* but rather to the validity of their *conclusions.* In other words, these arguments, in attacking whether the experts' conclusions are supported by their data and experiments, go the *weight* of the evidence,

---

2. In the 1980's, there were no tampons manufactured solely of cotton, so Hanna and Tierno used cotton wads for their experiments. They allegedly reached the same results. *See, e.g.,* Tierno and Hanna, *In vitro amplification of toxic shock syndrome toxin–1 by intravaginal devices,* Contraception 31: 185–194 (1985).

rather than to its relevance, or "fit." As the Supreme Court in *Daubert* noted, the "focus, of course, must be solely on principles and methodology, not on the conclusions they generate." *Daubert,* 113 S.Ct. at 2797.

In its most recent discussion of *Daubert,* however, the Supreme Court seems to have retreated from this strict focus on methodology alone. In *General Electric Co. v. Joiner,* — U.S. ——, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997), the Court noted that

> conclusions and methodology are not entirely distinct from one another. Trained experts commonly extrapolate from existing data. But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. *A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.*

*Joiner,* 118 S.Ct. at 518 (emphasis added).

Even assuming, however, that *Joiner* represents a retreat from *Daubert's* strict focus on methodology, the Court is not persuaded that the lack of epidemiologic data supporting plaintiff's experts' conclusions and their methodology's failure to replicate the specific conditions of the vaginal environment create such an "analytical gap." The Court cannot conclude, based upon the testimony at the hearing and the documents received, that the experts' conclusions are unreasonable in light of the data derived from their experiments. On the contrary: Dr. Hanna offered an eminently reasonable assessment of his rationale:

> The experiments are designed to determine if certain princip[les] are operating and if those principles are found to operate and, this is a phrase that I've used over and over again in articles that we've published, it is reasonable to presume. And what I mean by that is if you find that women who use tampon "x" are getting toxic shock and you take this tampon and you study it in the laboratory and you find that tampon "x" produces a lot of toxin compared to something else you are using, then it's reasonable to presume that this application of toxin by TSS, by the organ-

ism is the cause for these women getting TSS when they use the product.

Tr. at 99. Dr. Hanna went on compare his conclusions in the *Propensity* article to the kind of extrapolation a microbiologist would make in a typical situation:

> Every time a patient has an infection, and we test the organism that causes that infection for the susceptibility to antibiotics, I do it almost identical to what we are doing here, and you come to a determination that yes, this antibiotic is likely to work and this one is likely not to work because it is resistant.

*Id.* at 100. Moreover, absent flaws in the experts' methodology, the lack of epidemiological data supporting the *in vitro* testing simply is not fatal. *See Lakie v. Smithkline Beecham,* 965 F.Supp. 49, 56 (D.D.C.1997).

These objections then, along with several others discussed *infra,* are better suited to "the traditional and appropriate means of attacking shaky but admissible evidence," i.e., "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof[.]" *Daubert,* 113 S.Ct. at 2798.

**b. Presence of *staph aureus* in plaintiff's decedent**

The 1994 experiment utilized only *staph aureus* as the toxin-producing bacteria. Yet there is no evidence that *staph aureus* was present in the decedent at the time of her illness or death. Thus, defendant argues, plaintiff's expert testimony regarding their experiments does not fit the facts of this case.

There is less to this objection than meets the eye. Dr. Hanna testified—in testimony not challenged by defendant—that the case decision criteria for TSS established by the Centers for Disease Control ("CDC") does not require a finding of the presence of *staph aureus.* Tr. at 105. In fact, "[i]f the case definition criteria are fulfilled, as it was [sic] in this case, then it is presumed that the patient did, in fact, have the [*staph aureus* ] that caused the TSS." *Id.* The Court finds no reason to discredit this testimony. Ac-

cordingly, the experts' testimony is relevant to the case in this respect:

## 2. Scientific Knowledge

Defendant's next arguments deal with the first prong of the *Daubert* analysis—the "scientific knowledge" requirement. Defendant argues: (1) the experts experiments with cotton vs. rayon tampons do not control for other variables affecting toxin production, such as absorbent capacity, size, method of expansion, amount of oxygen and presence of surfactants;[3] (2) plaintiff's experts' assay (the method used to measure the amount of toxin produced in each flask) is faulty; (3) the experiments failed to show a dose/response effect with respect to increased amounts of rayon; and (4) the experts' conclusions have failed to gain general acceptance.

■ As to the first three of these objections, Drs. Hanna and Tierno took sharp issue with each of the criticisms. The Court is satisfied that such criticisms once again are properly addressed to the weight of the testimony, rather than to its admissibility. Indeed, Hanna and Tierno find as much fault with Dr. Parsonnet's experiments as he does with theirs.[4] In any event, Hanna and Tierno's methodology is neither esoteric nor novel. Neither is it perfect. Perfection, however, is hardly the standard:

> "The grounds for the expert's opinion merely have to be good, they do not have to be perfect. The judge might think that there are good grounds for an expert's conclusion even if the judge thinks that there are better grounds for some alternative conclusion, and even if the judge thinks that a scientist's methodology has some flaws such that if they had been corrected, the scientist would have reached a different result."

*In re Paoli Railroad Yard PCB Litigation,* 35 F.3d 717, 744 (3d Cir.1994), *cert. denied,* 513 U.S. 1190, 115 S.Ct. 1253, 131 L.Ed.2d 134 (1995). Dr. Parsonnet, in correcting what he perceives to be flaws in Hanna and Tierno's methodology, in fact reached a different result. The Court is satisfied it is the province of the jury to determine the more persuasive conclusions.

As to general acceptance, defendant correctly points out that Drs. Hanna and Tierno are alone in their conclusions. The majority of the scientific community, including the CDC and the FDA, finds no link between 100% cotton tampons and a lower risk of menstrual TSS. *See, e.g.,* Reingold, et al. *Risk Factors for Menstrual Toxic Shock Syndrome: Results of a Multi–State Case–Control Study,* 11 REVIEWS OF INFECTIOUS DISEASES S35, S38 (Supp.1, Jan.–Feb.1989); Broome, *Epidemiology of Toxic Shock Syndrome in the United States: Overview,* 11 REVIEWS OF INFECTIOUS DISEASES S14, S19 (Supp.1, Jan.–Feb.1989) (CDC study); 54 Fed.Reg. 43766, 43769 (1989) (FDA conclusions). Again, however, this dispute arises largely with respect to the *conclusions* of the experts. Skepticism with respect to a lack of general acceptance properly arises when " 'a known *technique* . . . has been able to attract only minimal support within the community[.]' " *Daubert,* 113 S.Ct. at 2786 (emphasis added) (quoting *United States v. Downing,* 753 F.2d 1224, 1242 (3d Cir.1985)). Other than Dr. Parsonnet's specific criticisms, defendant presents no evidence that the scientific community takes issue with Hanna and Tierno's methodology or techniques.

As to the remaining factors suggested in *Daubert* (and not addressed by the parties), the Court is satisfied that the experts' testimony bears sufficient indicia of reliability to render it admissible. Manna and Tierno's methodology has been published in peer-reviewed scientific journals for over ten years. Their conclusions are thoroughly "testable," and have been tested, as the sharply contrasting viewpoints elicited at the hearing

---

**3.** A surfactant is a chemical substance added to tampon fibers to make them more amenable to the manufacturing process.

**4.** Dr. Parsonnet himself agreed that there is [n]o consensus how to best test tampons and their components *in vitro* to determine their potential to increase the risk of toxic shock syndrome. A variety of testing systems have been described, but each makes assumptions or has limitations that prevents its adoptions as a universal method of testing. Tr. at 53.

illustrated. Though their testimony does not survive unscathed, neither can it be relegated to the realm of "junk science" with which *Daubert* was primarily concerned. *See Safrani v. Werner Co.,* 1997 WL 729110 at *1 (S.D.N.Y.); *see also Lappe v. American Honda Motor Co., Inc.,* 857 F.Supp. 222, 228 (N.D.N.Y.1994) (Hurd, M.J.) ("*Daubert's* narrow focus is on the admissibility of novel scientific evidence under Fed.R.Evid. 702."), *aff'd,* 101 F.3d 682 (2d Cir.1996).

For all of the foregoing reasons, defendant's motion to exclude plaintiff's expert testimony under *Daubert* is denied.

### D. Summary Judgment

■ Having determined that plaintiff's expert testimony is admissible under *Daubert,* the Court now denies defendant's motion for summary judgment on plaintiff's design defect claims. As the Court noted in its December 8, 1997 bench decision, plaintiff's evidence, "if believed by a jury, would establish a *prima facie* case of design defect based upon negligence and strict liability."

### III. Conclusion

For these reasons, it is hereby

ORDERED, that defendant's motions to exclude plaintiff's expert testimony and for summary judgment as to plaintiff's design defect claims are DENIED.