2004 WY 7

**Delores J. REICHERT, Petitioner,**

v.

**James A. PHIPPS and Gary L. Lanphier, Respondents.**

**No. 02–159.**

Supreme Court of Wyoming.

Feb. 11, 2004.

Representing Petitioner: Richard Wolf of Wolf & Tiedeken, LC, Cheyenne, Wyoming; and Jerry M. Smith of Sigler & Smith, Torrington, Wyoming.

Representing Respondents: John A. Sundahl and Brian J. Hanify of Sundahl, Power, Kapp & Martin, Cheyenne, Wyoming; and J. Kent Rutledge and Kevin C. Cook of Lathrop & Rutledge, P.C., Cheyenne, Wyoming.

Before HILL, C.J., and GOLDEN, LEHMAN, KITE, and VOIGT, JJ.

VOIGT, Justice.

[¶1] The petitioner, in a civil negligence action, has asked this Court to review the trial court's order prohibiting her from offering evidence at trial that the automobile collision at issue caused the fibromyalgia from which she suffers. Finding an abuse of discretion, we reverse.

## ISSUE

[¶2] Did the trial court abuse its discretion in excluding expert testimony that the automobile collision caused, contributed to, or triggered fibromyalgia?

## FACTS

[¶3] On August 26, 1996, the petitioner, Delores J. Reichert, was injured in an automobile accident that she claims was caused by the respondents, James Phipps and Gary Lanphier. She has filed a civil action in the district court in Goshen County, wherein she seeks recovery from the respondents for her injuries. The petitioner has designated two of her treating physicians, Robin R. Ockey, M.D., and Robert Monger, M.D., to testify that she suffers from fibromyalgia (FM) and that the FM was caused by the automobile accident. FM is a chronic musculoskeletal pain syndrome more fully described as follows:

> FM is a syndrome of widespread pain, decreased pain threshold, and characteristic symptoms, including non-restorative sleep, fatigue, stiffness, mood disturbance, irritable bowel syndrome, headache, paresthesias, and other·less common features. Widespread pain has generally been defined by the number of body regions involved ... or by a pattern of pain complaint that involves both sides of the body, upper and lower body, and axial skeleton. Decreased pain threshold (tenderness) is indicated by the proportion of specific sites that elicit complaints of pain on palpation.

Frederick Wolfe, *The Fibromyalgia Syndrome: A Consensus Report on Fibromyalgia and Disability*, 23 Journal of Rheumatology 534, 534 (1996) (footnotes omitted).

[¶4] In response to the petitioner's designation of expert witnesses, the respondents filed a Motion in Limine to Exclude Fibromyalgia Causation Claims and Motion for Determination Under Rule 56(d) of the Wyoming Rules of Civil Procedure.[1] The respondents do not contend that FM is not a recognized syndrome nor do they suggest that the petitioner does not suffer from FM. Rather, their position is that there is insufficient scientific knowledge to support the theory that FM can be caused by physical trauma. The trial court agreed with the respondents and granted their motion. In August 2002, we granted the petitioner's Petition for Writ of Review as to that question.

## STANDARD OF REVIEW

[¶5] Trial court rulings on the admissibility of evidence are reviewed for an

---

1. The purpose of a motion in limine is to obtain the court's pretrial ruling on the admissibility of evidence. W.R.C.P. 56(d) goes beyond that purpose to include the court's pretrial ruling on what facts are, and are not, in controversy.

abuse of discretion. *Clark v. Gale*, 966 P.2d 431, 435 (Wyo.1998). The ultimate issue is whether the trial court reasonably could have concluded as it did or whether it exceeded the bounds of reason under the circumstances. *Id.* (quoting *Hilterbrand v. State*, 930 P.2d 1248, 1250 (Wyo.1997)). This standard applies to a trial court's exclusion of expert testimony. *Chapman v. State*, 2001 WY 25, ¶ 8, 18 P.3d 1164, 1169 (Wyo.2001); *Bunting v. Jamieson*, 984 P.2d 467, 470 (Wyo.1999).

[¶ 6]  Expert testimony is admissible if it meets the requirements of W.R.E. 702:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

■ [¶ 7]  The United States Supreme Court has described a "gatekeeper" function for the trial court under Rule 702, whereby the reliability of proffered expert testimony is tested. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999); *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592–93, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), *cert. denied*, 516 U.S. 869, 116 S.Ct. 189, 133 L.Ed.2d 126 (1995). In *Bunting*, we adopted the *Daubert* analysis and made clear that it applies to the "opinions of a treating physician based on medical knowledge within the physician's specific area of expertise." *Bunting*, 984 P.2d at 471.

The primary goal of *Daubert's* gatekeeping requirement "is to ensure the reliability and relevancy of expert testimony. It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."

*Id.* (quoting *Black v. Food Lion, Inc.*, 171 F.3d 308, 311 (5th Cir.1999)).

■ [¶ 8]  In *Bunting*, we adopted *Daubert's* two-part test: first, the trial court is to determine whether the methodology or technique used by the expert is reliable, and second, the trial court must determine whether the proposed testimony "fits" the particular case. *Bunting*, 984 P.2d at 471. We also noted with approval the non-exclusive criteria that have been utilized to guide trial courts in making that first determination:

> 1) whether the theory or technique in question can be and has been tested; 2) whether it has been subjected to peer review and publication; 3) its known or potential rate of error along with the existence and maintenance of standards controlling the technique's operation; ... 4) the degree of acceptance within the relevant scientific community[;] ... [5)] the extensive experience and specialized expertise of the expert[;] ... [6)] whether the expert is proposing to testify about matters growing naturally and directly out of research [he has] conducted independent of the litigation; and [7)] the non-judicial uses to which the method has been put[.]

*Id.* at 472. As to the second part of *Daubert's* two-part test—whether the expert testimony "fits" the particular facts of the case—we concluded in *Bunting* that this is a question of relevance that incorporates the concept of "helpfulness" found in W.R.E. 702. In other words, " 'the expert's opinion must relate to an issue that is actually in dispute and must provide "a valid scientific connection to the pertinent inquiry." ' " *Bunting*, 984 P.2d at 472 (quoting *Graham v. Playtex Products, Inc.*, 993 F.Supp. 127, 130 (N.D.N.Y.1998) and Margaret A. Berger, *Procedural Paradigms for Applying the Daubert Test*, 78 Minn. L.Rev. 1345, 1351 (1994)).

■ [¶ 9]  Finally, we also recognized in *Bunting*, 984 P.2d at 471–73, three interrelated considerations that should be kept in mind by a trial court when performing the *Daubert* gatekeeping function. First, the trial court may consider one or more of the criteria mentioned in *Daubert*, but those factors may not all be helpful in every case, so the test must remain flexible enough to give the trial court broad latitude in determining reliability. Second, expert testimony must

be based upon reliable methodology, but it need not be so persuasive as to meet the proponent's burden of proof on an issue. "Shaky" but admissible evidence can be tested through traditional means, such as cross-examination, contrary evidence, and careful jury instruction. And third, a trial court's exclusion of evidence as unreliable is potentially inconsistent with the jury's duty to evaluate witness credibility and to assign evidentiary weight. To avoid usurping the jury's role, the trial court should limit its assessment to the soundness of the scientific principles and the propriety of the methodology and should not concern itself with the scientific validity of the conclusions offered by the expert.

## DISCUSSION

[¶ 10] We begin this discussion with a reminder of what it is this Court is deciding. We are not deciding whether trauma can cause FM, or even whether, as a general proposition, there is sufficient scientific foundation for the theory to allow juries to decide the issue as a question of fact. Rather, under an abuse of discretion standard, we are reviewing a district court's determination concerning a particular motion in limine. For that reason, cases from other jurisdictions that have considered FM as an element

of damages are informative, but are not of great precedential value because different materials were available at the motion hearings in those cases.[2] The question before us is limited to whether this particular trial court, given the evidence and arguments at the time, reasonably could have concluded as it did. The United States Court of Appeals for the Tenth Circuit has described the narrowness of such review as follows:

[W]e note that the scope of our review is quite narrow: we may reverse the district court's ruling only if we conclude that it abused its discretion in applying *Daubert* to exclude opinions of the Hollanders' experts. Because the district court has discretion to consider a variety of factors is [*sic.*] assessing reliability under *Daubert,* and because, in light of that discretion, there is not an extensive body of appellate case law defining the criteria for assessing scientific reliability, we are limited to determining whether the district court's application of the *Daubert* [*sic.*] manifests a clear error of judgment or exceeds the bounds of permissible choice in the circumstances. *See McEwen* [*v. City of Norman, Okla.,*] 926 F.2d [1539,] 1553–54 [ (10th Cir.1991) ] (discussing appellate review for an abuse of discretion). Thus, when coupled with this deferential standard of review, *Daubert's* effort to safeguard the re-

2. The following published FM cases were cited to the trial court: *Walker v. American Home Shield Long Term Disability Plan,* 180 F.3d 1065 (9th Cir.1999) (admissibility of testimony as to causal link between trauma and FM not an issue; issue whether plaintiff disabled as a result of FM); *Black,* 171 F.3d 308 (abuse of discretion to allow board certified physician to testify that a slip-and-fall caused FM); *Licciardi v. TIG Ins. Group,* 140 F.3d 357 (1st Cir.1998) (admissibility of testimony as to causal link between trauma and FM not an issue; issue is expert testimony beyond designation); *Lang v. Long–Term Disability Plan of Sponsor Applied Remote Technology, Inc.,* 125 F.3d 794 (9th Cir.1997) (admissibility of testimony as to causal link between trauma and FM not an issue; issue whether plaintiff's depression was FM-related); *Minner v. American Mortg. & Guar. Co.,* 791 A.2d 826 (Del.Super.2000) (temporal relationship insufficient to establish causal link between a building's condition and FM); *Hughes v. Scottsdale Ins. Co.,* 793 So.2d 537 (La.App. 2001) (admissibility of testimony as to causal link between trauma and FM not an issue; issue whether evidence sufficient to prove accident caused FM); *Young v. Hickory Business Furni-*

*ture,* 353 N.C. 227, 538 S.E.2d 912 (2000) (maxim *post hoc, ergo propter hoc*—after this, therefore because of this—insufficient to establish causal link between trauma and FM). The following unpublished cases were also cited to the trial court: *Byrum v. Superior Court, Los Angeles County,* 2002 WL 243565 (Cal.App.2002) (testimony as to causal link between trauma and FM not subject to state's non-*Daubert* reliability standard because not based on new or novel scientific theory or device); *Hultberg v. Wal–Mart Stores, Inc.,* 1999 WL 244030 (E.D.La.1999) (testimony that slip-and-fall caused FM unreliable); *Shepler v. Love,* 2001 WL 1104811 (Ohio App. 2001) (admissibility of testimony as to causal link between trauma and FM not an issue); *Jones v. Conrad,* 2001 WL 1001083 (Ohio App.2001) (treating physician's testimony that trauma caused FM inadmissible because not scientifically reliable). In her appellate briefing, the petitioner has also cited *Alder v. Bayer Corp., AGFA Div.,* 2002 UT 115, 61 P.3d 1068 (Utah 2002) (expert testimony as to FM causation not rendered inadmissible by conflict among experts, so long as the testifying expert's methodology, such as differential diagnosis, is a standard practice).

liability of science in the courtroom may produce a counter-intuitive effect: different courts relying on ... essentially the same science may reach different results. *See generally Federal Judicial Center, Reference Manual on Scientific Evidence* 27 (2d ed.2000) (observing that, in light of the abuse of discretion standard of review for *Daubert* determinations of reliability, "in theory judges are free to select different procedures and apply different factors to a particular expert or type of expertise than their colleagues do in the same district or circuit" and that "[a]s a consequence, similar cases could be resolved differently on the basis of inconsistent determinations about admissibility"); *see also Brasher [v. Sandoz Pharmaceuticals Corp.]*, 160 F.Supp.2d [1291] at 1298 n. 17 [ (N.D.Ala.2001) ] (observing that the Eighth Circuit's decision in *Glastetter [v. Novartis Pharmaceuticals Corp.]*, 252 F.3d [986] at 989–92 [ (8th Cir.2001) ], affirming the exclusion of Parlodel evidence as unreliable "does not necessarily [establish] that an inconsistent holding by this court would constitute an abuse of discretion").

*Hollander v. Sandoz Pharmaceuticals Corp.*, 289 F.3d 1193, 1206–07 (10th Cir.), *cert. denied*, 537 U.S. 1088, 123 S.Ct. 697, 154 L.Ed.2d 632 (2002).

[¶ 11] The parties supplied the trial court with voluminous materials to assist it in ruling on the motion.[3] Based on those materials, the respondents presented to the trial court a detailed argument as to why the proposed testimony of Drs. Monger and Ockey was inadmissible under *Daubert* scrutiny. Their essential points can be summarized as follows:

1. Dr. Monger's diagnosis was based on the petitioner's self-reporting, and Dr. Monger at first ruled out FM because petitioner's symptoms were not consistent with FM.

2. Dr. Monger admitted that there is no evidence that a single event causes FM, but that many physical and emotional stressors may be involved.

3. Dr. Monger admitted that the etiology and pathogenesis of FM are unknown to science, and that there are no controlled studies that link FM to trauma.[4]

4. Dr. Monger has no specialized training, has taken no specialized classes, has authored no articles, and has participated in no studies or research involving FM. Neither has he even read the seminal "Consensus Report" on FM.

5. When asked if he was "aware of any specific scientific standards for determining

3. In addition to the petitioner's medical records and the depositions of Drs. Ockey and Monger, the following items were provided to the trial court, for some of which full source information is not reflected in the record: Dan Buskila, M.D. and Lily Neumann, PhD., *Musculoskeletal Injury as a Trigger for Fibromyalgia/PostTraumatic Fibromyalgia* 104 (Israel 2000); Wolfe, *supra*, 23 Journal of Rheumatology 534; *Fibromyalgia Syndrome*, Arthritis Foundation (undated pamphlet); Dan Buskila, Lily Neumann, Genady Vaisberg, Daphna Alkalay, Frederick Wolfe, *Increased Rates of Fibromyalgia Following Cervical Spine Injury*, 40 Arthritis & Rheumatism 446 (1997); Leslie A. Aaron, Laurence A. Bradley, Graciela S. Alarcón, Mireya Triana–Alexander, Ronald W. Alexander, Michelle Y. Martin, Kristin R. Alberts, *Perceived Physical and Emotional Trauma as Precipitating Events in Fibromyalgia*, 40 Arthritis & Rheumatism 453 (1997); Kevin P. White, Simon Carette, Manfred Harth, Robert W. Teasell, *Trauma and Fibromyalgia: Is There an Association and What Does It Mean*, 29 Seminars in Arthritis & Rheumatism 200 (2000); Don L. Goldenberg, M.D., *Clinical Manifestations and Diagnosis of Fibromyalgia*, 9 Up to Date (2000); Don L. Goldenberg, M.D., *Differential Diagnosis of Fibromyalgia*, 9 Up to Date (2000); Don L. Goldenberg, M.D., *Pathogenesis and Treatment of Fibromyalgia*, 9 Up to Date (2001); Don L. Goldenberg, *Patient Information: Fibromyalgia*, 9 Up to Date (2000); Robert M. Bennett, *The Fibromyalgia Syndrome*, Textbook of Rheumatology 511 (5th ed.); *Criteria for the Classification of Fibromyalgia*, Primer on Rheumatic Diseases 457, adapted from F. Wolfe, HA Smythe, MB Yunus, et al., American College of Rheumatology (1990); Bruce Freundlich and Lawrence Leventhal, *The Fibromyalgia Syndrome*, Primer on Rheumatic Diseases 124, Arthritis Foundation; Muhammad B. Yunus, Robert M. Bennett, Thomas J. Romano, I. Jon Russell, et al., *Fibromyalgia Consensus Report: Additional Comments*, 3 Journal of Clinical Rheumatology 324 (1997).

4. "Etiology" refers to the cause and origin of a disease. "Pathogenesis" refers to the origination and development of a disease. Webster's Third New International Dictionary of the English Language Unabridged 782, 1655 (1993).

whether causation exists in the medical literature," Dr. Monger replied:

No. It's a very controversial syndrome. And I believe the problem rests primarily in that there's no objective test for fibromyalgia. The diagnosis rests on patient's self-reported symptoms. There's no blood test, there's no x-ray, there's no anything else. So it's controversial. Because you have to rely on the patient to tell you how they're doing, if they hurt, what caused their symptoms and so forth.

6. Dr. Ockey's diagnosis was also based exclusively on the petitioner's self-reporting.

7. Dr. Ockey has never participated in any research studies concerning FM and he has not read the "Consensus Report."

8. Dr. Ockey admitted that neither the cause nor the pathogenesis of FM is known in medicine.

9. Dr. Ockey admitted that he has no internal studies or monitoring to keep track of FM patients.

10. The medical literature evidences the lack of a scientific foundation for the theory that trauma may cause FM. For example:

a. Dan Buskila, M.D. and Lily Neumann, PhD., *Musculosekletal Injury as a Trigger for Fibromyalgia/PostTraumatic Fibromyalgia*, 104, 105 (Israel 2000):

A traumatic incident has been suggested as a possible etiologic factor relating to the onset of FM. Overall data from the literature are insufficient to indicate whether causal relationships exist between trauma and FM. The absence of evidence, however, does not mean that causality does not exist; rather, it posits that appropriate studies have not been performed.

b. Dan Buskila, Lily Neumann, Genady Vaisberg, Daphna Alkalay, Frederick Wolfe, *Increased Rates of Fibromyalgia Following Cervical Spine Injury*, 40 Arthritis & Rheumatism 446 (1997) (footnotes omitted):

Fibromyalgia syndrome (FMS) is a chronic, painful musculoskeletal disorder of unknown etiology. A growing body of epidemiologic evidence has shown it to be relatively common, occurring in up to 2% of the general population. Despite extensive research, the etiology and pathophysiology of FMS are still unclear. Disturbances in stage 4 sleep, hormonal and infectious factors, and stressful conditions have been suggested as possible progenitors. Although equivocal, some evidence has suggested that biomechanical disturbances in the cervical spine may play a role in the pathogenesis of FMS. Evidence that trauma can cause FMS comes from a few case series or case reports and is insufficient to establish causal relationships.

c. Wolfe, *supra*, 23 Journal of Rheumatology at 534 (footnotes omitted):

FM in the setting of work disability or compensation has been the subject of a number of reports. While the association between work disability or compensation and FM is well established, data regarding causality are largely absent. The clinical dilemma, whether an injury or workplace stress caused the patient's FM, a retrodictive (or It Did) causal proposition can rarely be determined to be certainly true or certainly false. Evidence that trauma can cause FM, a potential (or It Can) causal proposition, comes from a few case series or case reports and is insufficient to establish causal relationships. That trauma might cause FM sometimes, a predictive (or It Will) causal proposition, can only be addressed by epidemiological studies that measure the risk of potential exposures on the development of FM. Epidemiologic studies of trauma and FM needed to address potential or predictive causality are currently not available.

11. No leading case with precedential value has ruled admissible expert testimony to the effect that trauma causes FM. *See Black*, 171 F.3d 308.

[¶ 12] In their appellate briefing, the respondents have reiterated the foregoing arguments and they have chronicled the trial court's painstaking application of the *Daubert* principles in rendering its decision. In addition, the respondents have referenced the deposition of their designated expert,

John Rice, M.D., a Duke University Medical Center associate professor who has specialized in the study of FM, who participated in the conference resulting in the "Consensus Report," and who is of the opinion that the petitioner's FM symptoms were not caused by the automobile accident. Finally, the respondents have pointed out what they consider to be a major flaw in the opinions of the petitioner's experts: for the "differential diagnosis" methodology utilized by Drs. Ockey and Monger to be reliable, one must be able not only to "rule out" other causes, but to "rule in" the alleged cause:

> [W]e conclude that the district court did not abuse its discretion. In many of the decisions in which a differential diagnosis has been deemed reliable, the party relying on the diagnosis has offered independently reliable evidence that the allegedly dangerous drug or substance had harmful effects. *See, e.g., Zuchowicz v. United States,* 140 F.3d 381, 385–87 (2d Cir.1998) (affirming admission of differential diagnosis based in part on scientific articles regarding the effects of a drug); *Kennedy v. Collagen Corp.,* 161 F.3d 1226, 1228–30 (9th Cir.1998) (holding that the district court abused its discretion in excluding expert opinion based on differential diagnosis when the diagnosis was supported by scientific and clinical studies regarding the connection between collagen and autoimmune disorders). That is not the case here. In order to "rule in" Parlodel as a scientifically plausible cause of Ms. Hollander's stroke, the Hollanders' experts would need to present reliable evidence that the drug can cause strokes, and for the reasons we have discussed, the district court did not abuse its discretion in concluding that the experts did not do so. *See Glastetter [v. Novartis Pharmaceuticals Corp.,* 252 F.3d 986] at 989 [(8th Cir.2001) ] (affirming the district court's exclusion of a differential diagnosis); *cf. Siharath [v. Sandoz Pharmaceuticals Corp.,]* 131 F.Supp.2d [1347] at 1362–63 [ (N.D.Ga. 2001) ] ("[A] fundamental assumption underlying this method is that the final, suspected 'cause' remaining after this process of elimination must actually be capable of causing the injury. That is, the expert must 'rule in' the other suspected cause as well as 'rule out' other possible causes. And, of course, expert opinion on this issue of general causation must be derived from scientifically valid methodology.")

*Hollander,* 289 F.3d at 1210–11. In other words, a physician cannot, by ruling out other causes, conclude that an automobile accident caused a patient's FM, where there is no scientific basis for the conclusion that physical trauma can cause FM.

[¶ 13] The materials presented by the petitioner in opposition to the respondents' motion are included in the listings in footnotes 2 and 3 hereinabove. Based on those materials, the petitioner countered the respondents' position with a detailed argument as to why Drs. Monger and Ockey should be allowed to testify. The main points of that argument can be summarized as follows:

1. Dr. Monger is a board-certified rheumatologist, which is the area of expertise in which FM is treated, and he has treated the petitioner for years.

2. Dr. Monger made a complete differential diagnosis of the petitioner's FM symptoms and ruled out all causes other than physical trauma from the automobile accident.

3. In reaching his conclusion that the automobile accident had caused the petitioner's FM, Dr. Monger considered her pre- and post-accident medical history, as well as case reports of other persons "who develop fibromyalgia after trauma such as a motor vehicle accident."

4. Although Dr. Ockey is not a rheumatologist, there is considerable "overlap" between the chronic pain portion of rheumatology and his specialty, which is physical medicine and rehabilitation.

5. Eighty to ninety percent of Dr. Ockey's practice deals with chronic pain, and he sees a significant number of patients suffering from FM.

6. After a complete differential diagnosis of the petitioner's FM symptoms, Dr. Ockey diagnosed their cause as being physical trauma from the automobile accident. That diagnosis was based on the petitioner's reporting,

his experience over the years, and medical literature.

7. Recent medical literature contains support for the theory that physical trauma can cause FM. For example:

a. *Fibromyalgia Syndrome,* Arthritis Foundation at 7 (undated pamphlet):

Many different factors, alone or in combination, may trigger fibromyalgia. For example, a number of stresses—such as illness, emotional trauma, physical trauma or hormonal changes—may lead to the generalized pain, fatigue and non-restful sleep that characterize fibromyalgia.

Physical or emotional trauma can trigger fibromyalgia. For example, an infection, a case of the flu, or a car accident could lead to this syndrome. People with fibromyalgia may become inactive and anxious about their health, further aggravating the disorder.[5]

b. Don L. Goldenberg, M.D., *Pathogenesis and Treatment of Fibromyalgia,* 9 Up to Date (2001): "There is no evidence that a single event 'causes' fibromyalgia. Rather, many physical and/or emotional stressors may trigger or aggravate symptoms. These have included certain infections, such as a viral illness or Lyme disease, or physical trauma."

c. Robert M. Bennett, *The Fibromyalgia Syndrome,* Textbook of Rheumatology 511, 513 (5th ed.) (emphasis in original):

5. This language, which was quoted in the petitioner's memorandum of law in the trial court, comes from a copy of the Arthritis Foundation brochure attached as an exhibit to Dr. Monger's deposition. Dr. Monger's deposition, including the brochure, is attached to the petitioner's memorandum of law as Exhibit 1. Interestingly enough, attached to the memorandum of law as Exhibit 5 is a similar brochure from the Arthritis Foundation, with the same title, which contains the following version of the same section on FM causation:

No one knows what causes fibromyalgia. Researchers speculate that many different factors, alone or in combination, may cause fibromyalgia. For example, factors such as an infectious illness, physical trauma, emotional trauma or hormonal changes, may contribute to the generalized pain, fatigue and sleep disturbances that characterize the condition.

Patients frequently attribute an "event" to the onset of their symptoms. Attribution and rationalization are common human traits and *correlation* does not equal *causation.* Events that have been linked to the onset of fibromyalgia include flu-like illness, human immunodeficiency virus (HIV) infection, parvovirus infection, Lyme disease, toxic oil syndrome, persistent stress, chronic sleep disturbance, and physical trauma.

d. Buskila and Neumann, *supra,* at 106 (*quoting* D.J. Clauw and G.P. Chrousos, 4 *Chronic Pain and Fatigue Syndromes* 134–53 (1997)) (footnotes omitted):

Despite intensive research, major gaps in our understanding of the pathogenesis and etiology of FM still remain. Environmental triggers, including various emotional, immune, and physical trauma, have been implicated in the development of FM. Clauw and Chrousos emphasize that FM can be initiated by many triggers, all of which fall into the general category of "stressors." Thus, FM may be triggered or worsened by physical trauma, such as [motor vehicle accidents].

e. Buskila, Neumann, Vaisberg, Alkalay, Wolfe, *supra,* 40 Arthritis & Rheumatism at 446: "FMS [fibromyalgia syndrome] was 13 times more frequent following neck injury than following lower extremity injury. All patients continued to be employed, and insurance claims were not increased in patients with FMS." [6]

Studies have suggested that people with fibromyalgia have abnormal levels of several of the different chemicals that help transmit and amplify pain signals to and from the brain. Whether these abnormalities are a cause or a result of fibromyalgia is unknown.

Clearly, this is a far weaker statement that FM may be linked to physical trauma. Neither version of the brochure contained in the record bears a publication date, so there is no evidence as to which may reflect the more recent position of the Arthritis Foundation.

6. In this study, patients with neck injuries were compared to patients with lower extremity injuries. The second quoted sentence refers to one aspect of the study wherein it was determined that the patients suffering from FM did not file insurance claims at a higher rate than did those patients not suffering from FM, nor were they unemployed at a higher rate.

f. Bruce Freundlich and Lawrence Leventhal, *The Fibromyalgia Syndrome,* Primer on Rheumatic Diseases 124, 125 Arthritis Foundation:

> Muscular strain of the upper torso from motor vehicle accidents or sports injuries may produce aching and stiffness that simulates FMS with a limited number of tender points. Although FMS may initially be absent following an injury, these limited symptoms may persist causing disturbed sleep, and FMS may develop as a secondary process over time.

[¶ 14] In her appellate briefing, the petitioner has buttressed her trial court position with two particular points. First, the petitioner contends that differential diagnosis "is a standard scientific technique of identifying the cause of a medical problem by eliminating the likely causes until the most probable cause is isolated." *Westberry v. Gislaved Gummi AB,* 178 F.3d 257, 262 (4th Cir.1999). *See also Heller v. Shaw Industries, Inc.,* 167 F.3d 146, 156 (3rd Cir.1999). Where an expert's opinion is based on his treatment of the patient, the patient's medical history, the physician's training and experience, and the use of differential diagnosis, a lack of textual authority for his opinion goes to the weight, not the admissibility, of the testimony. *McCullock v. H.B. Fuller Co.,* 61 F.3d 1038, 1044 (2nd Cir.1995). *See also Alder v. Bayer Corp., AGFA Div.,* 2002 UT 115, 61 P.3d 1068, 1083–85 (Utah 2002).

[¶ 15] Next, the petitioner points out that the trial court did not appear to consider criticism of the "Consensus Report" found in Muhammad B. Yunus, Robert M. Bennett, Thomas J. Romano, I. Jon Russell, et al., *Fibromyalgia Consensus Report: Additional Comments,* 3 Journal of Clinical Rheumatology 324, 324–25 (1997) (*quoting* D.L. Sackett, W.M.M. Rosenberg, J.A.M. Gray, R.B. Haynes, W.S. Richardson, *Evidence Based Medicine: What It Is and What It Isn't* (1996)) (footnotes omitted and emphasis in original):

> With regard to injury and FMS [fibromyalgia syndrome], the Report emphasizes scientific causality and becomes involved in the jargons of retrodictive and predictive causal propositions. Causal propositions are rarely established with absolute certainty in the realm of medicine. An alternative (and better known) model is the consideration of consistency of association, strength of association, dose-response relationship, and biologic plausibility.... Additionally, the concept of evidence-based medicine integrate **both** data-based information and astute clinical observations. The comments of Sackett et al., on evidence-based medicine is worth noting: "Good doctors use both individual clinical expertise and the best available external evidence, and neither alone is enough. Without clinical expertise, practice risks becoming tyrannized by evidence...."
>
> In the context of a legal setting (where the Consensus Report is likely to be used), causality entails only 51% certainty, usually stated in terms of reasonable medical probability. Based on a consistent clinical pattern, case-control or descriptive studies, and biologic plausibility of central nervous system plasticity, it seems more than 51% likely that trauma does play a causative role in some FMS patients, as agreed by other independent observers. That trauma can cause localized or regional musculoskeletal pain is not arguable, rather the question is: can regional pain and tenderness become widespread? The biologic plausibility of such a spread of pain and tenderness is now supported by changes in the central nervous system (neuroplasticity), as well documented in animals (that have no obvious secondary gain!) and in humans.

[¶ 16] The trial court issued a four-page decision letter upon which the order granting the motion in limine was based. The trial court noted Wyoming's adoption of *Daubert* in *Bunting,* and then applied the four non-exclusive *Daubert* tests to the facts at hand:

> The premise that trauma causes fibromyalgia has not been adequately tested. Dr. Monger acknowledged that there are no controlled studies that connect fibromyalgia to trauma. Dr. Monger said he knew of some reports where fibromyalgia occurred after trauma, but apparently those

were anecdotal reports rather than statistically valid studies.

Dr. Ockey identified a study by Buskila as pointing to a causal connection, but had not read the study. Dr. Ockey agreed that "there are certain things associated with it (fibromyalgia), but the cause is not known."

Medical literature indicates a lack of testing. D. Buskila, one of the scientists who conducted the study Dr. Ockey knew about, concludes that "evidence that ... trauma can cause FM comes from a few case series or anecdotal case reports.... (D)ata are insufficient to indicate whether causal relationships exist between trauma and FM." *Buskila and Neumann,* Musculoskeletal Injury as a Trigger for Fibromyalgia/Post–Traumatic Fibromyalgia.

The peer review information presented to the Court indicates a controversy over traumatic cause of fibromyalgia, with a consensus report from many experts concluding that "epidemiological studies of trauma and FM needed to address potential or predictive causality are currently not available.... The cause(s) of FM are incompletely understood. There may be events reported by the patient as precipitating and/or aggravating, including physical trauma, emotional trauma, infection, surgery and emotional or physical stress." *The Fibromyalgia Syndrome: A Consensus Report on Fibromyalgia and Disability, Journal of Rheumatology* 534–537, 1996.

The Plaintiff was unable to provide any study or peer review which concluded that trauma caused fibromyalgia. She provided a monograph from the National Fibromyalgia Partnership, Inc., which states that "fibromyalgia syndrome often develops after a physical trauma." That document states that trauma *may* cause physiological changes which in turn result in fibromyalgia. This information is insufficient to establish peer review support for the theory that trauma causes fibromyalgia.

Plaintiff also points to a statement in the 1996 Consensus Report that physicians should consider the patient's opinion along with collateral information in determining the relationship between fibromyalgia and trauma. This statement does not constitute peer review or general acceptance of the proposition that trauma causes fibromyalgia. To the contrary, it indicates that if a doctor must determine whether a causal relationship exists he/she must use non-scientific information and methods.

No evidence established an error rate for any causation study results because no studies were presented. Calculating an error rate may be extremely difficult because a myriad of factors may contribute to fibromyalgia and because any physiologic basis for fibromyalgia is unknown.

The literature indicates that a causal connection between trauma and fibromyalgia is not generally accepted. Although scientists acknowledge the potential for a link, they consistently indicate that such a cause-effect connection has not been scientifically established.

Although the four *Daubert* factors are not exclusive, no other evidence gives scientific credibility to the theory that trauma from the accident caused fibromyalgia. Although both of Plaintiff's physicians offered an opinion that trauma did cause fibromyalgia, those opinions are based on subjective beliefs rather than on science.

(Emphasis in original.)

## CONCLUSION

[¶ 17] The trial court concluded that the proffered opinions of Drs. Monger and Ockey lacked scientific reliability. Applying *Daubert,* the trial court found that the theory of a causal link between physical trauma and FM has not adequately been tested and has not been subjected to sufficient peer review. Further, there have been no controlled studies, so no error rate has been established. After examining the materials presented to it, the trial court determined that the controversy over trauma-induced FM evidenced a lack of general acceptance of the theory within the medical community. Consequently, the expert testimony was ruled inadmissible.

[¶ 18] There are, however, countervailing facts and principles that must be con-

sidered. Clearly, differential diagnosis is an accepted method of diagnosing FM. Furthermore, some medical experts believe that physical trauma can cause FM. In that sense, the proposed expert's opinion cannot be said to be novel, either in approach or in conclusion.[7] Drs. Monger and Ockey are both well informed about FM, through training or experience, and both are the petitioner's treating physicians, rather than litigation-inspired experts.

[¶ 19] It is appropriate at this juncture to revisit two of the considerations raised in *Bunting*, 984 P.2d at 471–73. First, expert testimony must be based on reliable methodology, but it need not be so persuasive as to meet the proponent's burden of proof. Admissibility is just the first hurdle. Once admitted, expert testimony is subject to all the traditional means of testing evidence. And second, if the admissibility bar is raised too high, the court usurps the jury's duty to evaluate the expert's credibility and weigh the evidence. So long as the expert has reliable grounds for reaching his conclusion, his opinion is admissible, whether or not the court agrees with the expert's conclusion. *Bunting*, 984 P.2d at 473; *Heller*, 167 F.3d at 156.

[¶ 20] In the instant case, the proffered expert opinions were based on the petitioner's self-reported symptoms, filtered through the two doctors' perceptions after years of experience with similar patients. The opinions were given in the overall context of a professional controversy over the link between physical trauma and FM, in which some experts take the position that there is, indeed, a causal connection. We conclude that, under these circumstances, the trial court abused its discretion in not allowing the jury to determine the weight to give the opinion testimony.

[¶ 21] We reverse and remand to the trial court for further proceedings consistent with this opinion.

LEHMAN, Justice, dissenting.

[¶ 22] I agree with the majority's recitation of relevant law but disagree with the reasoning used in reaching its ultimate determination given the facts and circumstances that exist. Accordingly, I respectfully dissent.

[¶ 23] I am in accord that the ultimate issue is whether the trial court reasonably could have concluded as it did or whether it exceeded the bounds of reason under the circumstances when it granted respondents' motion in limine to exclude expert testimony. I also agree that when faced with such a determination, a trial court must act as a "gatekeeper" to determine the reliability of the proffered expert testimony by applying the flexible criteria set forth in *Bunting v. Jamieson*, 984 P.2d 467, 471–73 (Wyo.1999) (formally adopting in Wyoming the four non-exclusive tests to the facts at hand enunciated in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592–94, 113 S.Ct. 2786, 2796–97, 125 L.Ed.2d 469 (1993)).

[¶ 24] Perhaps most importantly, I embrace the proposition that a trial court must be given broad latitude in determining whether expert testimony is based upon reliable scientific methodology so as to make those conclusions offered by an expert admissible. Thus, as noted by the majority, quoting the United States Court of Appeals for the Tenth Circuit in *Hollander v. Sandoz Pharmaceuticals Corp.*, 289 F.3d 1193, 1206–07 (10th Cir.), *cert. denied* 537 U.S. 1088, 123 S.Ct. 697, 154 L.Ed.2d 632 (2002), our scope in reviewing such issues is very narrow—limiting our reversal of the trial court's decision solely if we conclude that it abused its discretion in excluding expert testimony.

[¶ 25] Here, as admitted by the majority, the trial court was presented with voluminous materials to assist in its ruling on the motion and ultimately made a detailed and painstaking application of the *Daubert* principles before rendering its decision. Upon my review of the analysis expressed in its four-page decision letter, I simply cannot conclude that the trial court clearly abused its discretion in rendering its decision. To the contrary, the trial court, based on the specific materials provided, reasonably determined that the literature was insufficient to scienti-

---

7. Even a novel conclusion is not necessarily in-

admissible. *Heller*, 167 F.3d at 156.

fically establish that a cause-effect connection exists between trauma and fibromyalgia (FM) and that, despite intensive research, major gaps in our understanding of the pathogenesis and etiology of FM remain.

[¶ 26] Furthermore, while I am not diametrically opposed to the utilization of "differential diagnosis" methodology by medical experts in rendering opinions on legal causation, I believe that such use must be carefully monitored. As disclosed by the majority, a fundamental assumption underlying this method is that the final, suspected "cause" remaining after this process of elimination is applied must actually be capable of causing the injury derived from scientifically valid methodology. In other words, the expert must be able to "rule in" the suspected cause, as well as "rule out" other possible causes based on an established scientific foundation. Upon my independent review, I conclude that the trial court did not unreasonably determine that such evidence was not presented in this case.

[¶ 27] Therefore, I would affirm the ruling of the trial court granting the motion in limine excluding the proffered expert testimony on the basis of its unproven scientific reliability.