Denise **MARAS** and Gary Maras, wife and husband, Plaintiffs,

v.

**AVIS RENT A CAR SYSTEM, INC.**

and Mohmed Ahmed,[1]
Defendants.

No. Civ.03–6191 RHK/AJB.

United States District Court,
D. Minnesota.

Jan. 14, 2005.

---

**1.** Although the docket shows the individual Defendant's name as Mohmed Ahmed, the Amended Complaint and Defendants' memorandum identify him as Mohamed Hussein. (*See* Am. Compl.; Defs.' Mem. in Supp. at 2.)

Byron M. Peterson and Jeanette P. Cogelow, Tomsche, Sonnesyn & Tomsche, PA, Golden Valley, MN, for Plaintiffs.

Shawn M. Raiter, Larson King, St. Paul, MN, for Defendants.

## MEMORANDUM OPINION AND ORDER

KYLE, District Judge.

### Introduction

While returning her Avis rental car, Denise Maras and an Avis employee, Mohamed Hussein, were involved in a minor car accident. Ms. Maras and her husband, Gary Maras, ("Plaintiffs") sued Avis Rent A Car System, Inc. ("Avis") and Hussein ("Defendants") alleging that the accident caused Ms. Maras's fibromyalgia[2] and aggravated a herniated disc in her back. Defendants have moved, pursuant to Rule 702 of the Federal Rules of Evidence and the Supreme Court's decision in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and its progeny, to preclude Plaintiffs' experts from testifying that the accident caused Ms. Maras's maladies. For the reasons set forth below, the Court will grant Defendants' Motion in part.

2. "[Fibromyalgia] is a syndrome of widespread pain, decreased pain threshold, and characteristic symptoms, including non-restorative sleep, fatigue, stiffness, mood disturbance, irritable bowel syndrome, headache, paresthesias, and other less common features." Frederick Wolfe, *The Fibromyalgia Syndrome: A Consensus Report on Fibromyalgia and Disability*, 23:3 J. of Rheumatology 534, 534 (1996). For the purposes of this Motion, Defendants concede that Ms. Maras suffers from fibromyalgia.

## Background

On February 19, 1999, Ms. Maras was returning her Avis rental car to the Minneapolis/St. Paul International Airport when an Avis employee, Mohamed Hussein, rear-ended her vehicle. (*See* Maras Dep. Tr. at 121; Hussein Dep. Tr. at 26–27.) As a result of the impact, Ms. Maras's body went forward, then backward, and her head and back hit the headrest of her seat. (Maras Dep. Tr. at 130–31.) By all accounts, the collision was relatively minor, although Ms. Maras's hands, arms, and legs went numb and she felt pain in her neck and back. (*Id.* at 131–32, 140.)

This was not the first, or the last, time Ms. Maras was in a car accident or injured her back. In 1980, her vehicle was hit on the passenger side door. (*Id.* at 31–33.) In 1989, she was in another car accident that caused her "a lot of trouble" with her neck and upper back. (*Id.* at 30.) Before her 1989 accident, she had seen a chiropractor for neck and upper back problems. (*Id.* at 31.) In 1990, she underwent a cervical spine fusion surgery (*id.* at 43), but continued to experience pain in her neck, middle back, arms, and hands (*id.* at 59–60). In 1992, she injured her lower back while bending over to pick something up. (*Id.* at 65–67.) In 1994, an MRI of her lower back showed the presence of a herniated disc. (*See* Raiter Aff. Ex. F.) In January 2001, she was in another car accident, but states that her back was not injured. (Maras Dep. Tr. at 173–77.) In June 2001, she fell in a bathtub, but again states that her back was not injured. (*Id.* at 177–78.)

Following the February 1999 accident at the Avis lot, Ms. Maras saw several doctors. On February 23, 1999, she saw her family practice doctor, Dr. Jim Anagnostis. (*See* Peterson Aff. Ex. CC; Maras Dep. Tr. at 144; Dr. Anagnostis Dep. Tr. at 8.) On that visit, Dr. Anagnostis diagnosed Ms. Maras with an "[a]cute exacerbation of a chronic back and neck problem with spasm and strain." (Peterson Aff. Ex. CC.) On later visits, in September 1999, April 2000, and January 2002, Dr. Anagnostis first suspected and then diagnosed Ms. Maras with fibromyalgia. (*Id.; see* Dr. Anagnostis Dep. Tr. at 20–24.) In his deposition, Dr. Anagnostis indicated that it is his opinion that the February 1999 accident caused Ms. Maras's fibromyalgia. (*See* Dr. Anagnostis Dep. Tr. at 36–37.) He also stated the following:

Q. As of February 2004, had you identified the cause of Ms. Maras's fibromyalgia?

A. I think I tried to indicate before, there's not just a—one cause.

Q. Had you identified any of the potential causes of her fibromyalgia?

A. I'm not sure I can answer that.

Q. Okay.

A. There's not—I'm—I can't tell you that there is one cause for fibromyalgia.

Q. The medical literature is inconclusive about what causes fibromyalgia, correct?

A. I would say that that's accurate.

(*Id.* at 31–32.) Before forming his opinion that the accident caused Ms. Maras's fibromyalgia, Dr. Anagnostis did not conduct fibromyalgia research, review supporting medical literature, or order scans, films, or labs for Ms. Maras. (*Id.* at 37–38.)

In February 2001, Ms. Maras saw Dr. Andrew Klymiuk, a psychiatrist who specializes in pain management. (Dr. Klymiuk Dep. Tr. at 7, 8.) In his deposition, he opined that the February 1999 accident was a cause of Ms. Maras's fibromyalgia. (*Id.* at 13–14, 33.) Dr. Klymiuk has not conducted research or published articles on fibromyalgia, and although he has read articles on the cause of fibromyalgia, he could not identify which articles he has

read. (*Id.* at 35–37.) He also testified that "nobody knows actually what causes fibromyalgia. There are some—I mean the cause of fibromyalgia is unknown. But fibromyalgia may be associated with a lot of other things, like psychological trauma, physical trauma, [and] illness...." (*Id.* at 38.)

In March 2004, Ms. Maras saw Dr. Marvin Faulkner, an anesthesiologist who specializes in pain management. (Dr. Faulkner Dep. Tr. at 6–8.) In his deposition, Dr. Faulkner opined that the February 1999 accident "accented," or aggravated, Ms. Maras's herniated disc in her lower back. (*Id.* at 23–24.) In forming his opinion, Dr. Faulkner relied upon Ms. Maras's self-report that her back felt worse after the accident, an August 2000 MRI of Ms. Maras's neck, and a March 2004 MRI of Ms. Maras's lower back. (*Id.* at 11–12, 23–26.) He could not recall being told that Ms. Maras had been diagnosed with a herniated disc before the 1999 accident or that Ms. Maras had been in another car accident and had fallen in a bathtub after the 1999 accident. (*Id.* at 28–29.) Nor did Dr. Faulkner review Ms. Maras's pre-accident medical records, including any prior MRI scans. (*Id.* at 12, 40.) Without viewing the pre-accident MRI scans, Dr. Faulkner conceded that he was unable to state with any reasonable certainty that Ms. Maras's herniated disc was worse after the accident.[3] (*See id.* at 29.)

In October 2003, Ms. Maras and her husband sued Avis and Hussein alleging that the February 1999 accident caused Ms. Maras's fibromyalgia and aggravated her herniated disc. (*See* Pls.' Mem. in Opp'n at 10–11, 23.) Avis and Hussein have moved for orders: (1) "Precluding Plaintiffs and their expert witnesses from offering any opinion testimony or evidence that Denise Maras'[s] alleged fibromyalgia was caused or aggravated by the February 19, 1999 incident at issue herein."; and (2) "Precluding Plaintiffs' treating physician, Dr. Marvin Faulkner, from offering any opinion testimony or evidence that the February 19, 1999 incident aggravated Ms. Maras'[s] pre-existing lower lumbar spine disc herniation." (Motion to Exclude Opinions From Plaintiffs' Expert Witnesses at 1.)

## Standard of Review

■ Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir.2001). Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed.R.Evid. 702. The proponent of the proposed expert testimony bears the burden of demonstrating by a preponderance of the evidence that the testimony is admissible. *See Lauzon*, 270 F.3d at 686.

■ In *Daubert*, the Supreme Court held that Rule 702 imposes a gatekeeping responsibility upon the district court to ensure that an expert's testimony is both relevant and reliable. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147, 119

---

**3.** Ms. Maras also saw Dr. Kelly Will, an anesthesiologist who specializes in chronic pain management. (Dr. Will Dep. Tr. at 6.) But Dr. Will testified that he had not been asked to provide an opinion in this case. (*Id.* at 14.)

S.Ct. 1167, 143 L.Ed.2d 238 (1999); *Daubert*, 509 U.S. at 589, 113 S.Ct. 2786; *Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.*, 254 F.3d 706, 714–15 (8th Cir.2001). *"Daubert* provides a number of nonexclusive factors a court can apply in performing this role: (1) whether the theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) whether the theory has been generally accepted." *Lauzon*, 270 F.3d at 686–87 (citations and internal quotations omitted). *"Daubert's* progeny provides additional factors such as: whether the expertise was developed for litigation or naturally flowed from the expert's research; whether the proposed expert ruled out other alternative explanations; and whether the proposed expert sufficiently connected proposed testimony with the facts of the case." *Id.* at 687 (citations omitted).

■■■ To carry out its gatekeeping responsibility, the court has discretion both in deciding *how* to evaluate an expert's reliability and in determining *whether* that expert's testimony is reliable. *Kumho Tire*, 526 U.S. at 152, 119 S.Ct. 1167. The inquiry is "a flexible one," and "[t]he focus ... must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 594–95, 113 S.Ct. 2786. The objective is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152, 119 S.Ct. 1167. In evaluating the admissibility of expert testimony, however, the court must also be mindful that "[v]igorous cross-examination [and the] presentation of contrary evidence ... are

the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596, 113 S.Ct. 2786 (citation omitted).

## Analysis

### A. Expert Testimony Re: Accident Caused or Aggravated Ms. Maras's Fibromyalgia

Plaintiffs indicate that Drs. Anagnostis and Klymiuk will testify that the February 1999 accident caused Ms. Maras's fibromyalgia. (*See* Pls.' Mem. in Opp'n at 9–10, 19–21.) Defendants contend that this testimony is unreliable and must be excluded. (*See* Defs.' Mem. in Supp. at 12–23.) They rely principally on two Fifth Circuit cases excluding as unreliable expert testimony that trauma causes fibromyalgia. (*See id.* at 13–23.) They also contend that the scientific understanding of the causes of fibromyalgia has not advanced since the most recent Fifth Circuit case. (*See id.*) Plaintiffs respond with two studies which they assert demonstrate the medical community's acceptance of their doctors' theory of causation. (Pls.' Mem in Supp. at 11–13.) Plaintiffs also assert that because Drs. Anagnostis and Klymiuk reached their opinions after conducting a differential diagnosis, their testimony is reliable. (*Id.* at 14–19.) The Court will begin with the Fifth Circuit case law.

In *Black v. Food Lion, Inc.*, 171 F.3d 308 (5th Cir.1999), the Fifth Circuit addressed the question of whether expert testimony regarding the causation of fibromyalgia by trauma was sufficiently reliable to be admissible. The testimony of the plaintiff's expert, who opined that the plaintiff's fibromyalgia was caused by a fall in the defendant's store, was admitted by the district court. *Id.* at 309–10. On appeal, the Fifth Circuit observed that "[w]hile the medical profession has made significant advances in the diagnosis and

treatment of fibromyalgia, experts have recognized that the evidence that trauma causes fibromyalgia is 'insufficient to establish causal relationships.'" *Id.* at 312 (quoting Frederick Wolfe, *The Fibromyalgia Syndrome: A Consensus Report on Fibromyalgia and Disability,* 23:3 J. of Rheumatology 534, 534 (1996)). After reviewing the materials submitted in support of the expert testimony, the Fifth Circuit determined that the testimony did not satisfy the *Daubert* factors for reliability. *See id.* at 313. It concluded that "neither [plaintiff's expert] nor medical science knows the exact process that results in fibromyalgia or the factors that trigger the process. Absent these critical scientific predicates, for which there is no proof in the record, no scientifically reliable conclusion on causation can be drawn." *Id.* at 314. The court held that the admission of the expert testimony was an abuse of discretion. *Id.* at 314–15.

In *Vargas v. Lee,* 317 F.3d 498 (5th Cir.2003), the Fifth Circuit revisited the admissibility of expert testimony on the cause of fibromyalgia. The testimony of the plaintiff's expert, who opined that the plaintiff's fibromyalgia was caused by a motor vehicle accident, was admitted by the district court. *Id.* at 500. On appeal, the Fifth Circuit observed that scientific understanding of fibromyalgia had not progressed sufficiently since *Black* to permit the admission of the expert's testimony. *Id.* at 501. It found that neither of the two studies produced by the plaintiff "indicate[d] that medical science has determined with any degree of reliability that trauma causes fibromyalgia." *Id.* (footnote omitted). One study "expressly disavowed" a causal connection, noting that "'the arguments both for and against a causal role of trauma in [fibromyalgia] are weak'" and that further research was needed. *See id.* at 501–02 (citing Kevin P. White, et al., *Perspectives on Posttraumat-*ic *Fibromyalgia: A Random Survey of Canadian General Practitioners, Orthopedists, Physiatrists, and Rheumatologists,* 27:3 J. of Rheumatology 790, 794 (2000)). The second study, while stating that trauma may cause fibromyalgia, acknowledged that "[t]he present data in the literature are insufficient to indicate whether causal relationships exist" and called for further research. *Id.* at 502 (quoting Dan Buskila, et al., *Increased Rates of Fibromyalgia Following Cervical Spine Injury,* 40:3 Arthritis & Rheumatism 446, 451 (1997)). The court found that these studies bolstered the "conclusion in *Black* that expert testimony on the causation of fibromyalgia syndrome by trauma is not sufficiently reliable to be admitted under Rule 702." *Id.* (footnote omitted). The court again held that the admission of the expert testimony was an abuse of discretion. *Id.* at 502–03.

In the present case, Plaintiffs attempt to distinguish *Black* and *Vargas* by offering two studies which they say support their doctors' testimony. The first, in which patients were asked to describe any trauma they had suffered in the 6–month period prior to the onset of their fibromyalgia, states that "our study *suggests* that physical trauma in the 6 months before the onset of symptoms is significantly *associated* with the onset of [fibromyalgia]." A.W. Al–Allaf, et al., *A Case–Control Study Examining the Role of Physical Trauma in the Onset of Fibromyalgia Syndrome,* 41:4 Rheumatology 450, 451, 453 (2002) (emphasis added). But, like the studies reviewed in *Vargas,* this study acknowledges that "[t]he aetiology [or cause] of primary [fibromyalgia] remains unclear" and that "[t]he role of physical trauma in precipitating fibromyalgia is uncertain...." *Id.* at 450. Also, like the *Vargas* studies, this study acknowledges that "[f]urther prospective studies are needed to confirm this association and to deter-

mine whether trauma has a causal role or if there are more important factors in the development of [fibromyalgia]." *Id.* at 453. Furthermore, this study conceded that its "results are, of course, retrospective and may be influenced by recall bias." *Id.* at 453.

The second "study" produced by Plaintiffs does not appear to be a scientific study at all. (*See* Peterson Aff. Ex. MM (Miryram Williamson, *Fibromyalgia 101, available at* http://www.mwilliams on. com/fm101.htm).) Rather, it is a page from an Internet website that baldly states that "[i]t is thought by most fibromyalogists that [fibromyalgia] can be triggered by illness or injury" without articulating the methodology or basis for its conclusion.[4] (*See id.*)

■ Upon consideration of the Fifth Circuit cases, which are not binding but which the Court finds persuasive and illuminating,[5] and the other materials submitted, the Court concludes that Plaintiffs have not met their burden under *Daubert* to show that the doctors' testimony is reliable. First, the theory that trauma causes fibromyalgia has not been verified by testing, nor has it been peer-reviewed. *See Black,* 171 F.3d at 313. The studies provided in this case, as well as those in *Black* and *Vargas,* conclude that the causal link

between trauma and fibromyalgia remains unproven. *See id.* ("If medical science does not know the cause, [the doctors'] 'theory' of causation, to the extent it is a theory, is isolated and unsubstantiated."). Dr. Anagnostis acknowledged that the literature is inconclusive about what causes fibromyalgia. (Dr. Anagnostis Dep. Tr. at 32.) Dr. Klymiuk likewise conceded that "nobody knows actually what causes fibromyalgia" and that "the cause of fibromyalgia is unknown." (Dr. Klymiuk Dep. Tr. at 38.) On their own terms, the doctors' opinions include "conjecture, not deduction from scientifically-validated information." *Black,* 171 F.3d at 313. Second, the doctors' theory, which has not been verified or subjected to peer review, has no known potential rate of error. *Id.* Finally, it follows that the theory has failed to gain general acceptance. *Id.* "Experts in the field conclude that the ultimate cause of fibromyalgia cannot be known, and only an educated guess can be made on the patient's history. . . . Mere conjecture does not satisfy the standard for general acceptance. . . ." *Id.* (citation omitted).

■ Plaintiffs argue that their doctors' testimony is reliable because their opinions were arrived at after conducting differential diagnoses. (Pls.' Mem. in Opp'n at 14–19.)

---

4. For their part, Defendants have produced studies which conclude that it remains an open question as to whether trauma causes fibromyalgia and that further studies are needed. *See* Kevin P. White, et al., *Classification, Epidemiology, and Natural History of Fibromyalgia,* 5 Current Pain and Headache Reports 320, 326 (2001) (stating that "further studies are required to verify the[ ] results" of studies linking fibromyalgia and trauma); Gregory C. Gardner, *Fibromyalgia Following Trauma: Psychology or Biology?,* 4 Current Review of Pain 295, 298 (2000) ("The current state of the literature does not allow the conclusion that trauma and fibromyalgia are causally associated."); Kevin P. White, et al.,

*Trauma and Fibromyalgia: Is There an Association and What Does It Mean?,* 29:4 Seminars in Arthritis and Rheumatism 200, 201, 209 (2000) (stating that "there is limited evidence either to support or refute an association between trauma and [fibromyalgia]," that "[w]hether an association exists between trauma and [fibromyalgia] remains a question," and that "[f]urther studies are needed. . . .").

5. Plaintiffs rely upon *Reichert v. Phipps,* 84 P.3d 353, 364 (Wyo.2004) (finding expert opinion testimony on the cause of fibromyalgia admissible), which the Court finds unpersuasive.

In performing a differential diagnosis, a physician begins by 'ruling in' all scientifically plausible causes of the plaintiff's injury. The physician then 'rules out' the least plausible causes of injury until the most likely cause remains. The final result of a differential diagnosis is the expert's conclusion that a defendant's product [or conduct] caused (or did not cause) the plaintiff's injury.

*Glastetter v. Novartis Pharm. Corp.*, 252 F.3d 986, 989 (8th Cir.2001) (citation omitted). Generally, "a medical opinion about causation, based upon a proper differential diagnosis, is sufficiently reliable to satisfy *Daubert.*" *Turner v. Iowa Fire Equip. Co.*, 229 F.3d 1202, 1208 (8th Cir.2000). But a district court may exercise its gatekeeping responsibility to exclude those diagnoses that are scientifically invalid. *Kudabeck v. Kroger Co.*, 338 F.3d 856, 861 (8th Cir.2003).

The Eighth Circuit has excluded medical opinions about causation that were based upon differential diagnoses. For example, in *Glastetter*, the issue was whether a medication called Parlodel caused the plaintiff's stroke. 252 F.3d at 987. Each of the plaintiff's experts conducted a differential diagnosis which concluded that Parlodel had caused her stroke. *Id.* at 989. They theorized that the medication causes arteries to constrict (vasoconstriction), that vasoconstriction results in elevated blood pressure, and that high blood pressure is a known risk factor for strokes. *Id.* In assessing this theory, the court noted that while the experts' chain of reasoning seemed sound, its major premise was unproven because "[the plaintiff's] experts failed to produce scientifically convincing evidence that Parlodel causes vasoconstriction." *Id.* Thus, the court agreed with the district court that the differential diagnoses performed by the plaintiff's experts should be excluded "because they lacked a proper basis for 'ruling in' Parlodel as a

potential cause of [strokes] in the first place." *Id.* (citation omitted).

Here, as in *Glastetter*, Plaintiffs have not shown that either Dr. Anagnostis or Dr. Klymiuk had a proper basis for "ruling in" the February 1999 accident as a potential cause of Ms. Maras's fibromyalgia. As noted above, Plaintiffs have failed to demonstrate that their doctors' opinion testimony is reliable and, as aptly stated by the Fifth Circuit, the use of a differential diagnosis does not change this result:

No one doubts the utility of medical histories in general or the process by which doctors rule out some known causes of disease in order to finalize a diagnosis. But such general rules must, under *Daubert* [and] *Kumho Tire* ... be applied fact-specifically in each case. The underlying predicates of any cause-and-effect medical testimony are that medical science understands the physiological process by which a particular disease or syndrome develops and knows what factors cause the process to occur. Based on such predicate knowledge, it may then be possible to fasten legal liability for a person's disease or injury.

In this case, neither [the plaintiff's doctor] nor medical science knows the exact process that results in fibromyalgia or the factors that trigger the process. Absent these critical scientific predicates, for which there is no proof in the record, no scientifically reliable conclusion on causation can be drawn. [The plaintiff's doctor's] use of a general methodology cannot vindicate a conclusion for which there is no underlying medical support.

*Black*, 171 F.3d at 314 (footnote omitted).

While Plaintiffs have failed to demonstrate that their doctors' testimony is reliable, this Court "do[es] not ... purport to hold that trauma does not cause fibromyal-

gia syndrome or that the admission of expert testimony on that subject is permanently foreclosed. Medical science may someday determine with sufficient reliability that such a causal relationship exists." *Vargas,* 317 F.3d at 503. As the Supreme Court recognized in *Daubert:* "[I]n practice, a gatekeeping role for the judge, no matter how flexible, inevitably on occasion will prevent the jury from learning of authentic insights and innovations. That, nevertheless, is the balance that is struck by Rules of Evidence designed not for the exhaustive search for cosmic understanding but for the particularized resolution of legal disputes." 509 U.S. at 597, 113 S.Ct. 2786 (footnote omitted).

Accordingly, the Court will grant Defendants' Motion to preclude Plaintiffs from offering the opinion testimony of Dr. Anagnostis or Dr. Klymiuk or other evidence that Ms. Maras's fibromyalgia was caused or aggravated by the February 1999 accident.[6]

### B. Dr. Faulkner's Expert Testimony Re: Accident "Accented" Ms. Maras's Herniated Disc In Her Lower Back

The parties agree that Dr. Faulkner has not reviewed Ms. Maras's pre-accident medical records and that he is unable to state an opinion as to whether the accident "accented," or aggravated, Ms. Maras's herniated disc unless he can review those records. (*See* Defs.' Mem. in Supp. at 23–24; Pls.' Mem. in Opp'n at 23; Dr. Faulkner Dep. Tr. at 12, 29, 40.) Plaintiffs suggest, however, that once Dr. Faulkner reviews those records he will be qualified to form such an opinion. (*See* Pls.' Mem. in Opp'n at 23–24.) Defendants reply that

**6.** Defendants also argue that Plaintiffs' doctors lack the education, training, and experience necessary to testify about the cause of fibromyalgia. (Defs.' Mem. in Supp. at 25–

showing Dr. Faulkner the records at this time would violate the Pretrial Scheduling Order "by failing to timely disclose [Plaintiffs'] expert opinions and the bases for those opinions." (Defs.' Reply Mem. in Supp. at 6.)

At oral argument, Plaintiffs' counsel indicated that he has had difficulty in obtaining Dr. Faulkner's opinion and that he thought that the doctor had reviewed Ms. Maras' pre-accident records prior to rendering his opinion. He also noted that Magistrate Judge Boylan has determined, under the circumstances unique to this case, that written reports from Ms. Maras's treating physicians are not required and that Defendants may depose those witnesses. (*See* Doc. No. 11.) In light of this situation, and in the interests of justice, the Court will modify the Pretrial Scheduling Order and direct Plaintiffs to provide Defendants with Dr. Faulkner's proposed opinion testimony by February 8, 2005.

### Conclusion

Based on the foregoing, and on all the files, records, and proceedings herein, **IT IS ORDERED** that Defendants Avis Rent A Car System, Inc.'s and Mohamad Hussein's Motion to Exclude Opinions From Plaintiffs' Expert Witnesses (Doc. No. 12) is **GRANTED IN PART** as follows:

A. Plaintiffs are precluded from offering the opinion testimony of Dr. Anagnostis or Dr. Klymiuk or other evidence that Ms. Maras's alleged fibromyalgia was caused or aggravated by the February 19, 1999 accident at issue in this case; and

B. As to Dr. Faulkner:

26.) Given that the doctors' testimony will be excluded for lack of reliability, the Court need not reach this ground for exclusion.

1. By February 8, 2005, Plaintiffs shall provide to Defendants a written report prepared and signed by Dr. Faulkner containing a complete statement of all opinions to be expressed and the basis and reasons therefor; the data or other information considered by Dr. Faulkner in forming his opinions; any exhibits to be used as a summary of or support for the opinions; Dr. Faulkner's qualifications, including a list of all publications he has authored within the preceding ten years; the compensation to be paid for the study and testimony; and a listing of any other cases in which Dr. Faulkner has testified as an expert at trial or by deposition within the preceding four years.

2. Defendants may take Dr. Faulkner's deposition after receiving his written report.

3. Defendants may challenge Dr. Faulkner's proposed opinion testimony by filing a motion in limine.